[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12678
Non-Argument Calendar
_____

D.C. Docket No. 8:16-cr-00422-JDW-MAP-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM HAROLD WRIGHT, JR.,
a.k.a. William Wright,
a.k.a. "Flat Top",

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 2, 2020)

Before MARTIN, ROSENBAUM, and ED CARNES, Circuit Judges.

PER CURIAM:

William Harold Wright, Jr. appeals his convictions and sentences for one count of conspiracy to possess heroin with intent to distribute it and six counts of possessing heroin and aiding and abetting another in possessing it with intent to distribute it.  He challenges the sufficiency of the indictment, the district court's finding that he knowingly and voluntarily waived his right to counsel, and the application of a sentencing enhancement based on his co-conspirator's use of a firearm.[1]

I.

We first consider Wright's argument that the district court erred by denying his motion to dismiss the indictment because it did not sufficiently inform him of the charges against him.  Count One of the indictment alleged that Wright, "[f]rom an unknown date, which was at least in 2015, through on or about September 28, 2016, in the Middle District of Florida and elsewhere . . . knowingly and willfully conspire[d] and agree[d] with other persons both known and unknown to the Grand Jury, to possess with intent to distribute and to distribute" a kilogram or more of

---

[1] Although he is represented by appointed counsel in this appeal, Wright filed pro se a letter asking us to take "judicial notice" of certain arguments he had asked counsel to raise in his appellate brief.  He then filed another letter challenging the sufficiency of his indictment, complaining about his appellate counsel's performance, and asking this Court to issue an opinion.  We have already denied Wright's motion for substitution of counsel and his motion for reconsideration of that denial.  Because Wright is represented by counsel on appeal, pro se filings are not permitted.  See 11th Cir. R. 25-1 ("When a party is represented by counsel, the clerk may not accept filings from the party.").  Even if we were to consider the documents that he has submitted pro se, we note that "a criminal defendant's appellate counsel is not required to raise all nonfrivolous issues on appeal."  Payne v. United States, 566 F.3d 1276, 1277 (11th Cir. 2009).

heroin, in violation of 21 U.S.C §§ 841(b)(1)(A), 846.  Counts Two through Seven alleged that Wright, "[o]n or about [a specific date], in the Middle District of Florida . . . knowingly and intentionally possess[ed], and aid[ed] and abet[ted] another in possessing, with intent to distribute" heroin, in violation of § 841(a)(1), (b)(1) and 18 U.S.C. § 2.  The dates for the charged substantive offenses were all between October 22, 2015, and July 27, 2016.

Wright moved to dismiss the indictment.  He argued that the indictment was deficient because it failed to specify the location of the conspiracy or name his co-conspirators and also because it provided an "open ended" date for the conspiracy.  And he argued that the substantive counts failed to allege whom he aided and abetted or in what way.  The district court found the indictment sufficient and denied the motion.

Wright reasserts on appeal the arguments that he made in the district court.  He also contends for the first time that there was a fatal variance in the indictment because the government presented evidence at trial that the conspiracy began in 2014 instead of in 2015.

Whether an indictment sufficiently alleges an offense is a question of law that we review de novo.  United States v. Steele, 178 F.3d 1230, 1233 (11th Cir. 1999).  "An indictment is sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and

3

(3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." Id. at 1233–34 (quotation marks omitted). "The validity of an indictment is governed by practical, not technical considerations." United States v. Varkonyi, 645 F.2d 453, 456 (5th Cir. Unit A May 1981).[2]  The appropriate question is whether the indictment "conforms to minimal constitutional standards." Id.  Wright's indictment did.

"An indictment charging a conspiracy under 21 U.S.C. § 846 need not be as specific as an indictment charging a substantive count." United States v. Pease, 240 F.3d 938, 943 (11th Cir. 2001) (quotation marks omitted).  We have held that alleging an offense occurred within a judicial district is sufficient to describe the location of the offense.  See United States v. Yonn, 702 F.2d 1341, 1348 (11th Cir. 1983).  Wright's indictment alleged that he committed crimes in the Middle District of Florida.  And we have held that "absent a discovery order, the [government] has no general obligation to disclose the names of unindicted co-conspirators who will not be called as witnesses." United States v. White, 846 F.2d 678, 693 (11th Cir. 1988); cf. United States v. Martinez, 96 F.3d 473, 477 (11th Cir. 1996) (upholding a defendant's conviction where the indictment alleged

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

that the defendant conspired with "unknown persons"). While Wright's indictment did not name specific co-conspirators, the district court noted that the government identified the co-conspirators it intended to call as witnesses, and during discovery Wright sought information for purposes of cross-examining and impeaching those witnesses. Wright's indictment was sufficient as to the conspiracy charge even though it did not specify a location narrower than the Middle District of Florida and did not list his co-conspirators by name.

We also have upheld as sufficient an indictment alleging that the defendants engaged in a conspiracy occurring "[f]rom on or about January, 1978 to on or about December 1981, the exact dates being to the Grand Jury unknown." United States v. Harrell, 737 F.2d 971, 974–75 & n.3 (11th Cir. 1984); accord Pease, 240 F.3d at 943 & n.4 (holding that an indictment was sufficient when it alleged that the defendant had conspired to distribute drugs with other persons known and unknown to the grand jury, from an unknown start date to a specified end date). Wright's indictment alleged that he conspired with others to possess a kilogram or more of heroin with the intent to distribute it beginning "at least in 2015" and continuing "through on or about September 28, 2016." Wright relies on a Ninth Circuit decision, United States v. Cecil, 608 F.2d 1294, 1295 (9th Cir. 1979), but even if that decision were binding authority, it does not fit these facts. In Cecil, the Ninth Circuit held that an indictment charging a drug conspiracy "beginning on or

5

before July, 1975 and continuing on or after October, 1975" was insufficient because it was "open-ended in both directions." Id. at 1297. Wright's indictment, by contrast, was not open-ended in both directions: it included an end date of "on or about September 28, 2016." The start date of "at least in 2015," along with the specific end date and the dates of the substantive charges, provided enough notice to Wright of the dates of the alleged conspiracy to "conform[ ] to minimal constitutional standards." Varkonyi, 645 F.2d at 456.

The substantive offenses were also sufficiently alleged because Wright's indictment did not have to specify the names of the people he aided and abetted or how he did it. See United States v. Martin, 747 F.2d 1404, 1407 (11th Cir. 1984) (explaining that "[a]iding and abetting need not be specifically alleged in the indictment"); see also United States v. Sharpe, 438 F.3d 1257, 1263 n.3 (11th Cir. 2006) ("It is not necessary for an indictment to allege in detail the factual proof that will be relied upon to support the charges." (alteration and quotation marks omitted)).

Wright also contends that there was a fatal variance between the allegations of the indictment and the evidence presented at trial. He did not raise that contention in the district court, so we review it only for plain error. See United States v. De La Garza, 516 F.3d 1266, 1269 (11th Cir. 2008). Wright must show that an error occurred, that the error was plain, that the error affected his

6

substantial rights, and that the failure to correct the error would seriously affect the fairness of the judicial proceeding.  Id.  Wright cannot show any error, so he cannot establish plain error.

The evidence at trial showed that the conspiracy existed in 2014, which Wright asserts was before the 2015 start date as charged in the indictment.[3]  But the indictment did not allege that the conspiracy started in 2015.  Instead it alleged that the conspiracy began "at least in 2015," which means that it may have begun before 2015.  Evidence that the conspiracy already existed in 2014 is not inconsistent with the time period alleged in the indictment.  See United States v. Gold, 743 F.2d 800, 813 (11th Cir. 1984) (explaining that a "variance exists where the evidence at trial proves facts different from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations").  And we have held that when the government proves at trial that the defendant committed a crime before the indictment was returned and within the statute of limitations, the allegation of a different date in the indictment is generally not a fatal variance.  United States v. Grapp, 653 F.2d 189, 195 (5th Cir. 1981); see also United States v. Roberts, 308 F.3d 1147, 1156 (11th Cir. 2002) ("[We] will not disturb a conviction due to a

---

[3] A witness named Jerry Cunningham testified at trial that Wright paid him to transport shipping crates in 2014.  The government relied in part on this testimony to establish that the conspiracy existed in 2014.

variance between the date the indictment alleges the offense occurred and the date the proof shows that it occurred if the date shown at trial falls within the statute of limitations and before the return of the indictment."). Because the statute of limitations for a violation of 21 U.S.C. § 846 is five years, see 18 U.S.C. § 3282(a), and the indictment was returned in 2016, proof at trial of the conspiracy having existed as early as 2014 was not fatal.

## II.

Wright also contends that the district court erred by finding that he knowingly and voluntarily waived his right to counsel. He challenges the adequacy of the court's pretrial Faretta[4] inquiry and argues that the court should have conducted a second inquiry before sentencing.

The record shows that Wright has a history of being dissatisfied with his representation: five different counsel and six appointments and discharges within the span of less than two years. On the same day that a criminal complaint was filed against him, Wright was appointed counsel. A few weeks after that, Wright retained counsel, and appointed counsel's motion to withdraw was granted. About a month later, Wright and his retained counsel agreed that counsel should withdraw from representation, and after conducting a hearing, the court granted their mutual

---

[4] Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975).

request and a continuance of the trial.  The court appointed Wright's third attorney, Timothy Fitzgerald, to represent him.

Two months later, citing disagreements related to discovery and the filing of motions, Wright filed a motion asking that Fitzgerald be discharged and new counsel appointed.  The court denied the motion, finding no good cause to discharge Fitzgerald.  It also warned Wright that if he "continue[d] to reject competent counsel through his uncooperative behavior (or his explicit renunciation of counsel), the Court may, in its discretion, conclude [he] has voluntarily waived his right to counsel."  Wright filed two more motions to replace Fitzgerald as counsel, and the court construed the second motion as a request to proceed pro se and scheduled a Faretta inquiry.

At that inquiry the court found that Wright had "given [it] no reason, now or in the past, to remove [] Fitzgerald."  The court asked Wright if he wanted to continue with Fitzgerald or represent himself.  Wright responded that he did not want to do either and that the court was forcing him to proceed pro se.  The court and Wright then had a lengthy colloquy on the subject.  The court reviewed with Wright the charges against him and the penalties he faced, and it asked Wright if he had ever represented himself in a criminal case.  Wright said that he had.  Then came these questions and answers:

> THE COURT: Do you understand that if you represent yourself, you're on your own?

9

THE DEFENDANT: Yes, I understand that.

THE COURT: And that the court is not going to tell you how to try your case or give you advice on how to try your case?

THE DEFENDANT: Yes.

THE COURT: Are you familiar with the rules of evidence?

THE DEFENDANT: Yes, I am.

THE COURT: Do you understand that during the course of the trial the court rules on matters of evidence or objections?

THE DEFENDANT: Excuse me, Judge Your Honor, I think I [will] probably retain an attorney before we even get that far, but —

THE COURT: Let me explain to you — because you've told me that you want to represent yourself.

THE DEFENDANT: Go ahead.

THE COURT: Do you understand that when the court makes a ruling, that you'll have to abide by that ruling.

THE DEFENDANT: Yes, sir.

THE COURT: We've discussed earlier about the Rules of Criminal Procedure. I talked about Rule 16. Are you familiar with the Rules of Criminal Procedure?

THE DEFENDANT: Yes.

THE COURT: Do you understand that those rules govern the way the court structures the trial?

THE DEFENDANT: Yes, I do.

THE COURT: And that they'll be applied equally to you as they would be the government?

THE DEFENDANT: Yes, I do.

THE COURT: At our January hearing I told you that I did not think it was a good idea for you to represent yourself and at that time you agreed.

THE DEFENDANT: Well, I don't have a choice in this matter, Judge Your Honor.

THE COURT: No, you have a choice.

THE DEFENDANT: No, I don't have a choice. I might well be representing myself if I'm getting represented by somebody that's not giving me — I mean, what else am I going to do? I mean, like I say, all my rights is being denied, you know, technically denied. My right to file motions is being denied. My right to reply to the prosecutor's response is being denied. Everything is being denied.

　　　. . .

10

THE COURT: So I'll ask you one more time: Is it your desire to represent yourself?

THE DEFENDANT: Yes, yes, yes.

THE COURT: All right. I find that you have knowingly and voluntarily waived your right to counsel and that you elect to proceed pro se.

The court found that Wright had "rejected his competent, conflict-free counsel and instead elected to represent himself . . . [and] ha[d] chosen a deliberate course of conduct — to ignore his appointed counsel and to represent himself with full knowledge of the consequences that choice brings." The court noted that "[t]o say that [Wright] has been uncooperative with his lawyers, past and present, would be a flattering characterization of his behavior towards them."

After just two months of representing himself, however, Wright again filed a motion requesting the appointment of new counsel. After the court denied the motion, Wright "reluctantly" asked to have Fitzgerald reappointed. The court granted the motion and appointed Fitzgerald as counsel for a second time. It didn't last long. Less than a month later, Wright filed a motion to discharge Fitzgerald and be appointed new counsel. The court discharged Fitzgerald but denied Wright's request for new counsel, finding that his waiver of counsel still stood.[5] On the second day of trial, Wright requested the appointment of standby trial counsel. The court appointed Kevin Beck.

---

[5] The court later appointed new standby counsel for the limited purpose of assisting Wright with accessing digital discovery.

11

After the jury found Wright guilty of all charges, the court changed Beck's role, appointing him to represent Wright at sentencing.  But Wright filed a motion to discharge Beck and be appointed new counsel, arguing that Beck had deterred him from filing certain motions.  The court held a hearing on the motion and found no good cause to discharge Beck.  The court then advised Wright as follows:

> THE COURT: You have two choices: You can represent yourself or you can let Mr. Beck represent you. . . . Those are the only two choices you have.  That's under Eleventh Circuit and United States Supreme Court authority.  You must let me know what your choices are.
> MR. WRIGHT: Judge Your Honor, I'm not having him represent me and I'm not going to waive my right to counsel.
> THE COURT: You have already waived your right to counsel, I've made that determination . . .
> MR. WRIGHT: I never waived my right to counsel, Judge.
> THE COURT: That's your position. You can tell the Eleventh Circuit about it, sir.

The court dismissed Beck as counsel and found that Wright had "waived his right to be represented [by] appointed counsel by going through[,] by [its] count[,] six different lawyers, knowing full well that if he chose to dismiss or attempt to dismiss another court-appointed counsel, he would be on his own."  The court held the sentence hearing four days later.

Wright does not challenge the finding that there was no good cause to discharge Fitzgerald or Beck.  Instead, he contends that he did not knowingly and voluntarily waive his right to counsel.

12

A district court's conclusion that a defendant knowingly and voluntarily waived his Sixth Amendment right to counsel is a mixed question of law and fact that we review de novo. United States v. Garey, 540 F.3d 1253, 1268 (11th Cir. 2008) (en banc). A criminal defendant can decline his Sixth Amendment right to counsel and affirmatively assert his right to represent himself by "knowingly and intelligently" waiving the right to counsel. Faretta v. California, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975). In that situation, the "ideal method" of ensuring that a defendant understands the consequences of the waiver is to conduct a "Faretta inquiry" in which the court "inform[s] the defendant of the nature of the charges against him, possible punishments, basic trial procedure and the hazards of representing himself." United States v. Kimball, 291 F.3d 726, 730 (11th Cir. 2002) (quotation marks omitted). We have identified several factors that are important in determining whether a defendant's decision to proceed pro se is valid. Id. at 730–31.[6]

In certain circumstances, a defendant's conduct may lead a court to conclude that he has knowingly and voluntarily waived his right to counsel. In Garey an

---

[6] Those factors are: (1) the defendant's age, health, and education; (2) the defendant's contact with lawyers before trial; (3) the defendant's knowledge of the nature of the charges and possible defenses and penalties; (4) the defendant's understanding of the rules of evidence, procedure, and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed and, if so, the extent to which standby counsel aided in the trial; (7) any mistreatment or coercion of the defendant; and (8) whether the defendant was attempting to manipulate the trial. Kimball, 291 F.3d at 730.

uncooperative defendant rejected counsel but also refused to affirmatively invoke his right to self-representation.  540 F.3d at 1257.  In that case, the district court concluded that no conflict with counsel existed and then asked the defendant several times whether he wanted to continue with the same attorney or represent himself.  Id. at 1259–62.  The defendant refused to choose.  Id. at 1262.

We rejected the defendant's contention that he had not knowingly and voluntarily waived his right to counsel.  Id. at 1269–70.  We held that a defendant's uncooperative behavior can waive his right to counsel if he refuses the services of competent, conflict-free counsel with awareness of his options and of the potential consequences.  Id. at 1267.  We noted that the "best practice" is for a district court to try first to engage the defendant in a Faretta inquiry, but if the defendant refuses, it is enough "for the court to inform [him] unambiguously of the penalties he faces if convicted and to provide him with a general sense of the challenges he is likely to confront as a pro se litigant."  Id.  The district court followed that "best practice" here.

The court repeatedly warned Wright that there was no good cause to discharge his appointed counsel — first Fitzgerald, then Beck — and that Wright must either continue with counsel or proceed pro se.  Like the defendant in Garey, Wright refused to make that choice and continued to demand new counsel.  But, absent good cause, an indigent defendant has no right to demand a different

14

appointed lawyer.  See id. at 1263.  Once it became apparent that Wright would not choose between the competent, conflict-free counsel he was offered and proceeding pro se, the court conducted a Faretta inquiry.  See Garey, 540 F.3d at 1266.

In that inquiry, the court reviewed the charges against Wright and the penalties he faced.  It explained that he would be bound by the rules of evidence and criminal procedure, and it confirmed that Wright understood.  The court cautioned Wright that it was not a "good idea" to proceed pro se, that he would be on his own, and that the court could not give him advice on how to try his case.  After its inquiry, which gave Wright exactly the information we suggested in Kimball it should, 291 F.3d at 730, the court then asked, "Is it your desire to represent yourself?"  Wright replied, "Yes, yes, yes."  That was enough.[7]

Because the record shows that Wright knowingly and voluntarily elected to proceed pro se, the court was not required to conduct a second Faretta inquiry

---

[7] Wright argues that some of the Kimball factors weigh against a finding that his waiver was valid.  He notes that the court failed to ask him about his age or physical or mental health, but he does not state how those characteristics affected his ability to knowingly and voluntarily waive his right to counsel.  And, contrary to his contention, the court did ask him if he had experience in representing himself in a criminal trial, and he replied that he had.  Wright argues that the court failed to question him as to his defenses or to "test him" on his understanding of the trial court's rules and procedures.  But the purpose of a Faretta inquiry, as aided by the Kimball factors, is "only to determine whether [Wright] understood that rules do exist . . . [and] that he would be bound by [them]."  Kimball, 291 F.3d at 731.  He assured the court that he did.

15

when Wright again declined to be represented by counsel at his sentence hearing.[8]

See Nelson v. Alabama, 292 F.3d 1291, 1295 (11th Cir. 2002) (recognizing that

failing to hold a Faretta hearing is not error as a matter of law if the record

demonstrates that the defendant knowingly and voluntarily elected to represent

himself).

### III.

Wright's final argument is that the district court erred by applying a

sentencing enhancement under U.S.S.G. § 2D1.1(b)(1) for his co-conspirator's

possession of a firearm.  He challenges the court's findings that his co-conspirator,

Ernest Wooten, possessed a gun in furtherance of the conspiracy and that Wooten's

possession of it was reasonably foreseeable to Wright.[9]

We review the district court's findings of fact under the guidelines for clear

error and its application of the guidelines to those facts de novo.  United States v.

Pham, 463 F.3d 1239, 1245 (11th Cir. 2006).  Under the sentencing guidelines, a

two-level enhancement is appropriate when "a dangerous weapon (including a

firearm) was possessed" in connection with a drug offense.  U.S.S.G.

§ 2D1.1(b)(1).  The enhancement is designed to account for "the increased danger

---

[8] Wright's rejection of Fitzgerald after his reappointment, which followed Wright having been pro se for several months, further shows that he knowingly and voluntarily chose to represent himself with direct knowledge of the consequences.

[9] Wooten possessed both a handgun and a rifle, but the district court found that only the possession of the handgun was in furtherance of the conspiracy.

of violence when drug traffickers possess weapons." Id. cmt. n.11(A).  It applies to a co-conspirator's possession of a firearm when "the possession was in furtherance of the conspiracy, . . . the defendant was a member of the conspiracy at the time of possession, and . . . the co-conspirator's possession was reasonably foreseeable by the defendant."  United States v. Fields, 408 F.3d 1356, 1359 (11th Cir. 2005) (quotation marks omitted).  To prove that the possession was in furtherance of the conspiracy, the government need only show that the firearm "was present."  Id.  Once the government meets this burden, the burden shifts to the defendant to demonstrate that a connection between the weapon and the offense was "clearly improbable."  Id.

At trial Wooten testified that he had been involved with Wright in a heroin distribution scheme for approximately two years.  He stored heroin belonging to Wright at his house and, at Wright's direction, would deliver it to a man named Robert Lee.  Lee would then pay Wright for the heroin.  Police conducted a search of Wooten's home and recovered heroin and "a couple of guns."  At sentencing, FBI Special Agent Jesse Marotta testified that Wooten admitted to owning the guns that were seized from his house.

Based on that testimony, it was not error for the court to conclude that Wooten possessed the gun at his house where he stored heroin for Wright in furtherance of the conspiracy.  See id.  And Wright could not show that a

17

connection between the gun and the offense was "clearly improbable." See id. (holding that a connection between a seized firearm and the drug conspiracy was not clearly improbable where firearms were present at locations where co-conspirators sold drugs); United States v. Fernandez, 58 F.3d 593, 599 (11th Cir. 1995) (noting that the defendant dried and stored marijuana at his trailer and rejecting his argument that it was clearly improbable that a pistol found in his trailer was connected with the drug offense).

Nor did the court err in determining that it was reasonably foreseeable to Wright that Wooten would have a gun to protect the heroin he was storing at Wright's direction. See Fields, 408 F.3d at 1359–60. We have noted that "guns are a tool of the drug trade," that "[t]here is a frequent and overpowering connection between the use of firearms and narcotics traffic," and that it is "reasonably foreseeable that a co-conspirator would possess a firearm where the conspiracy involved trafficking in lucrative and illegal drugs." Pham, 463 F.3d at 1246 (quotation marks omitted). In the trafficking trade, "drugs and guns go together." United States v. Lopez, 649 F.3d 1222, 1242 (11th Cir. 2011) ("[T]his Court has long recognized that, as Forrest Gump might say, drugs and guns go together like peas and carrots."). The district court did not err in enhancing Wright's sentence under § 2D1.1(b)(1).

**AFFIRMED.**

18